UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

---

[1] ROBYN COSSLETT

    Plaintiff,

  v.

[2] THE SPINE AND PAIN CENTER LLC

    Defendant.

---

**Civ. No.** 24-cv-00242-JFJ

**COMPLAINT**

Plaintiff, ROBYN COSSLETT ("Plaintiff" or "Ms. Cosslett"), by and through her undersigned counsel, EISENBERG & BAUM, LLP, hereby states her Complaint against Defendant, THE SPINE AND PAIN CENTER LLC ("Defendant" or "SPC"):

## INTRODUCTION

1. This case is about access—access to information and healthcare services. Plaintiff Robyn Cosslett is Deaf and primarily communicates in American Sign Language ("ASL"). She requires an ASL interpreter to receive equal treatment and equally effective communication.

2. On or before October 30, 2023, Ms. Cosslett sought help from SPC for her persistent nerve and spine pain. Rather than offering to provide an ASL interpreter, SPC informed Ms. Cosslett that she must bring her own interpreter.

3. Ms. Cosslett is entitled to equal access to SPC's services as are enjoyed by non-disabled persons.

4. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendant's unlawful discrimination on the basis of disability in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"); Title III of the Americans with Disabilities Act ("ADA"); the Oklahoma Anti-

Discrimination Act ("OADA"); and common law.

## PARTIES

5.      Plaintiff ROBYN COSSLETT ("Plaintiff" or "Ms. Cosslett") is a resident of Owasso, Oklahoma, who is substantially limited in the major life activities of hearing and speaking. Thus, she has a disability within the meaning of federal civil rights laws.

6.      Defendant The Spine and Pain Center LLC is a professional corporation engaged in the practice of medicine with a principal place of business located at 1844 E 15th Street, Tulsa, Oklahoma 74104. Defendant has a registered agent for service c/o Brian Torgerson, 3336 E 32nd Street, Suite 220, Tulsa, Oklahoma 74105. At all times relevant to this Complaint, Defendant has been licensed and doing business in the State of Oklahoma. Defendant's business is a public accommodation within the meaning of federal civil rights laws.

7.      Upon information and belief, Defendant is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction for the federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims arising under state and city law.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because, among other factors, the Defendant resides within this district's jurisdiction, and a substantial pa rise to the claims occurred in this district.

## **STATEMENT OF FACTS**

10. Ms. Cosslett is a Deaf individual who primarily communicates in American Sign Language. She is substantially limited in the major life activities of hearing and speaking within the meaning of federal, state, and city civil rights laws.

11. Some background on Deaf culture is necessary to understand the balance of this case. English and ASL are different languages; therefore, Ms. Cosslett is unable to communicate effectively by reading lips. Lip reading is the ability to understand another speaker's speech by watching the speaker's lips. It is no substitute for direct communication through a qualified sign language interpreter because many mouth movements appear identical on the lips. What is more, even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, she or she would still not necessarily understand the English language because English and ASL are distinct languages with different grammatical structures. As another example, ASL and French Sign Language are also distinct languages.

12. Due to the inherent limitations of lipreading, she cannot make out most of the aural information that is presented during important healthcare communications, such as treatment planning and consultations. It is not possible for people who lipread to consistently understand everything that is said by lipreading alone. Common difficulties associated with lipreading include but are not limited to: normal speech is too fast to lipread easily, many sounds are not seen on the lips, many speech patterns look similar on the lips, and many sounds look alike, even though they are different.

13. There are many factors outside of Ms. Cosslett's control that reduce the effectiveness of lipreading because many people, including medical care professionals and other patients, may not speak clearly, have facial hair or accents that interfere with lipreading, cover

parts of their mouth when speaking, and/or may not look directly at the person who is lipreading.

14. Note-writing is similarly ineffective in facilitating effective communication for Ms. Cosslett. ASL is a language unique from English, much like Spanish and French are unique languages. Writing a note in English to someone whose primary language is French does not surmount the communication barrier; the note is still written in a language unfamiliar to the other party. The same is true of ASL. Merely writing the message in English does not change the fact that the message is communicated in the reader's non-native and non-primary language. Further, someone communicating by writing a note will necessarily include less detail and context than they would when speaking due to the inherently limited nature of a short, written note. As a result, note-writing — even when paired with lipreading — cannot facilitate effective communication in a medical setting for Ms. Cosslett, whose primary language is ASL.

15. Ms. Cosslett first intended to visit SPC in September 2023.

16. Ms. Cosslett contacted SPC's office using a video phone. This device allows a deaf individual to make calls via an interpreter through video relay services. She asked to make an appointment and requested American Sign Language interpretation services.

17. The receptionist who answered the phone ensured Ms. Cosslett that SPC would secure an ASL interpreter for her appointment.

18. Comforted by this assurance, Ms. Cosslett scheduled an appointment for September 26, 2023.

19. When Ms. Cosslett arrived for her appointment on September 26, 2023, no interpreter was present.

20. In desperate need of medical assistance, Ms. Cosslett attended her appointment anyway. Without an interpreter, she had significant difficulty communicating with the doctor by

4

relying on lip reading alone. As a result, she did not have a full understanding of her treatment plan.

22. Ms. Cosslett scheduled a follow-up appointment for October 25, 2023. When scheduling, the receptionist once again assured her that they would schedule an interpreter for her next appointment.

22. When Ms. Cosslett arrived for her appointment on October 25, 2023, no interpreter was present.

23. Once again, in desperate need of treatment, Ms. Cosslett attended her appointment without an interpreter. She again did not fully understand her communications with the doctor or her treatment plan because she was forced to lip-read.

24. The receptionist again assured Ms. Cosslett that she would have an interpreter for her next appointment. Relying on this assurance, Ms. Cosslett scheduled a follow-up appointment for November 3, 2023.

25. Prior to her appointment, Ms. Cosslett decided to call and confirm that SPC had indeed scheduled an interpreter for her.

26. On or about October 30, 2023, Ms. Cosslett called SPC via video phone.

27. SPC transferred Ms. Cosslett to several people before she finally spoke with SPC employee Lorena.

28. SPC employee Lorena stated she "[did] not know who handles that" and then put Ms. Cosslett on hold to check with her manager, Sarah Kowalenk.

29. Lorena stated that Ms. Kowalenk informed her that SPC does not set up interpreters for patients and that Ms. Cosslett would have to "do that [herself]."

30. When Ms. Cosslett arrived around 9:20 AM on November 3, 2023, for her

appointment, she wrote a note to the receptionist saying, "I'm Robyn Cosslett and I have an appointment today. Had interpreter show up yet or have you call to find me an interpreter?" The receptionist replied by writing a note on the same piece of paper: "As per the call on 10/30/2023 we do not provide an interpreter & that is the patient's responsibility. We do not have an interpreter waiting unfortunately. Are you able to call one?"



31.     As a result, Ms. Cosslett left without seeing a doctor or getting treatment for her persistent pain.

32. Without an interpreter, Ms. Cosslett is unable to fully and equally participate in her care and treatment.

33. Deaf patients are entitled to communicate through American Sign Language interpreters.

34. By failing to provide an interpreter, SPC violated Ms. Cosslett's rights as a disabled person under federal civil rights laws.

35. Upon information and belief, based on Ms. Cosslett's interactions with SPC and SPC's stated policies, Defendant refuses to hire qualified sign language interpreters as a matter of policy and practice.

36. Because SPC failed to ensure effective communication, Ms. Cosslett was offered services that were objectively inferior to those provided to hearing patients.

37. Accordingly, Ms. Cosslett, as a person seeking medical treatment, had an expectation interest in the ability to fully participate in her own medical care and all of the benefits and services provided by SPC, including but not limited to vital discussions with medical staff. Ms. Cosslett also had an expectation interest in being able to communicate with and be informed about her care by SPC in her primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require.

38. SPC knew or should have known of its obligations as a health care provider under federal anti-discrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including the provision of ASL interpreters to ensure equal communication, participation, and treatment of deaf individuals.

39. SPC knew or should have known that its actions and inactions created an unreasonable risk of causing Ms. Cosslett greater levels of emotional distress than a hearing person

would be expected to experience.

40. Ms. Cosslett seeks any and all remedies available under contract law, including expectation-interest damages and specific performance. SPC must honor her right to understand her treatment and medical history by providing ASL interpreters to explain her prior history and procedures. A recitation of her care, with the ability to ask questions, would put Ms. Cosslett in as good a position as if the contract had been performed.

41. SPC repeatedly and intentionally discriminated against Ms. Cosslett and acted with deliberate indifference to her communication needs, causing her to endure humiliation, fear, anxiety, and emotional distress.

42. SPC intentionally and deliberately discriminated against Payen by failing to make reasonable modifications in policies, practices, or procedures.

43. Ms. Cosslett would seek Defendant's services in the future given its proximity to her residence and SPC's reputation as a leading medical provider for her conditions, but she is deterred from doing so due to the discrimination she faced and expects to face in the future.

## CAUSES OF ACTION

**CLAIM I:   Violations of the Patient Protection and Affordable Care Act**

44. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

45. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act has been in full force and effect and applied to the Defendant's conduct.

46. At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

47. At all times relevant to this action, Plaintiff's primary language for communication

has been American Sign Language (and not English), and Plaintiff has had limited ability to read, write, speak, or understand English. Plaintiff has therefore been an individual with limited English proficiency within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 45 C.F.R. § 92.4.

48.    At all times relevant to this action, Defendant received federal financial assistance, including Medicare reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendant is engaged in a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

49.    Pursuant to Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

50.    Under the Affordable Care Act, federal regulations adopt "the standards found at 28 CFR 35.160 through 35.164," which come from Title II of the Americans with Disabilities Act. 45 C.F.R. § 92.102(a).

51.    Under the Affordable Care Act, federal regulations provide that a "[covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner,

and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b), *adopted by* 45 C.F.R. § 92.102(a). This regulation authoritatively construes the Affordable Care Act and was violated by Defendant.

52. Further, a covered entity "shall not require an individual with a disability to bring another individual to interpret for her or her." 28 C.F.R. § 35.160(c)(1), *adopted by* 45 C.F.R. § 92.102(a). This regulation authoritatively construes the Affordable Care Act and was violated by Defendant.

53. Under the Affordable Care Act, federal regulations provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–(iv). This regulation authoritatively construes the Affordable Care Act and was violated by Defendant.

54. As set forth above, Defendant discriminated against Plaintiff, on the basis of disability, in violation of the Patient Protection and Affordable Care Act and its implementing regulations.

55. The Patient Protection and Affordable Care Act, by incorporating the enforcement

mechanism of the Rehabilitation Act, extends a cause of action to "any person aggrieved" by discrimination in violation thereof. 42 U.S.C. § 18116(a).

56. The Rehabilitation Act—and by extension, the ACA—explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]she remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

57. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

58. As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

59. 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

60. Defendant has failed to implement policies, procedures, and training of staff

necessary to ensure compliance with the ACA.

61. As set forth above, Defendant discriminated against Plaintiff on the basis of her disability in violation of the ACA and its implementing regulations and, by doing so, aggrieved Plaintiff under the statute and its implementing regulations.

62. The plaintiff is also entitled to other forms of compensatory damages beyond emotional distress damages. The defendant is subject to remedies traditionally available in suits for breach of contract. Here, when patients like Plaintiff arrive seeking treatment, they expect that they will be able to communicate with their healthcare providers about their care. Plaintiff also had an expectation interest in being able to communicate with and be informed about her care by Defendant's staff in her primary or preferred language or through some other equally effective form of communication because that is what federal antidiscrimination laws require.

63. Defendant denied Plaintiff these expectation interests by failing to accommodate her disability and failing to provide equal treatment that it gives to non-disabled patients. Accordingly, the Plaintiff should be entitled to compensatory damages under her expected interest.

64. Plaintiff is therefore entitled to declaratory and injunctive relief, nominal damages, compensatory damages, and attorneys' fees, costs, and disbursements for the injuries and loss she sustained as a result of the Defendant's discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

**CLAIM II:   Violations of Title III of the Americans with Disabilities Act**

65. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

66. At all times relevant to this action, Title III of the ADA, 42 U.S.C. § 12181, et seq., has been in full force and effect and has applied to Defendant's conduct.

67. At all times relevant to this action, Plaintiff has been substantially limited in the

major life activities of seeing, hearing and speaking, and is therefore an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

68. Defendant owns, leases, and/or operates a place of public accommodation within the meaning of the ADA, 42 U.S.C. § 12181(7)(F).

69. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

70. Title III of the ADA defines discrimination to include denying participation or offering unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A).

71. Title III of the ADA further defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

72. Defendant discriminated against Plaintiff on the basis of her disability in violation of the ADA.

73. On information and belief, the refusal to offer onsite interpreter services is the result of a policy or practice of Defendant to prohibit or impede the use of onsite qualified sign language interpreters without regard to whether other methods will provide effective communication.

74. Plaintiff is therefore entitled to injunctive relief, as well as an award of attorney's fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1) and/or common law.

**CLAIM III: Violations of the Oklahoma Anti-Discrimination Act**

75. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

76. At all times relevant to this action, the Oklahoma Anti-Discrimination Act, Okla. Stat. tit. 25 § 1101 *et seq.*, has been in full force and effect and has applied to Defendant's conduct.

77. The Oklahoma Anti-Discrimination Act ("OADA") prohibits "deny[ing] an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a 'place of public accommodation' because of race, color, religion, sex, national origin, age, or disability." Okla. Stat. tit. 25, § 1402.

78. Defendant is a place of public accommodation within the meaning of the OADA because it "supplies goods or services to the general public or [] solicits or accepts the patronage or trade of the general public or [] is supported directly or indirectly by government funds." Okla. Stat. tit. 25, § 1401.

79. The OADA "shall be construed according to the fair import of its terms to further the general purposes stated in this section and the special purposes of the particular provision involved." Okla. Stat. tit. 25, § 1101.

80. In line with the Act's general purpose of creating recourse for individuals facing discrimination, Section 1350 of the OADA creates a private right of action for disability discrimination in the employment context and, accordingly, for disability discrimination by places of public accommodation. Okla. Stat. tit. 25, § 1350.

81. Defendant refused to provide Ms. Cosslett with a qualified ASL interpreter, thus denying her access to its services and discriminating against her on the basis of her disability.

82. Plaintiff is entitled to reasonable attorney's fees pursuant to Okla. Stat. tit. 25, § 1506.8.

## CLAIM IV: Negligence

83. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

84. Defendant owed Plaintiff a duty of care under Title III of the ADA and the ACA by nature of its status as a place of public accommodation and a medical provider in receipt of federal funds.

85. At all relevant times, Defendant had a duty to exercise reasonable care in providing appropriate accommodations to patients with disabilities and implementing policies and procedures in accordance with federal and state law.

86. By not fulfilling its duty and discriminating against Ms. Cosslett, Defendant caused Ms. Cosslett emotional harm and suffering due to the inherently distressing nature of civil rights violations.

87. Plaintiff is therefore entitled to compensatory damages for emotional pain and distress and punitive damages as applicable, with an amount to be determined by the court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Issue an injunction forbidding Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf individuals meaningful access to, and full and equal enjoyment of, Defendant's facilities, services, or programs in violation of Section 1557 of the Patient Protection and Affordable Care Act, Title III of the Americans with Disabilities Act; Oklahoma Anti-Discrimination Act; and common law;

B. Issue an injunction ordering Defendant to:

      i. offer an interpreter for the patient at no cost to the patient whenever an agent or employee encounters a patient whose primary language is something other than English;

      ii. train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under federal law;

      iii. honor Plaintiff's right to understand her medical care history by providing American Sign Language interpreters to explain her prior history and procedures because a recitation of her care, with the ability to ask questions, would put her in as good a position as if the contract had been performed;

      iv. develop, implement, promulgate, and comply with a policy requiring a clear offer of language assistance services. If a patient declines language assistance services after a bonafide offer of qualified sign language interpreter services at Defendant's own cost, document such refusal in a specific and uniform location in the patient's medical records, such that it can be readily retrieved in a review of those records. Such documentation shall include, at a minimum: (1) an acknowledgment, signed by the patient, that the availability of free language assistance services was explained to the patient in the patient's primary language and that she or she knowingly declined those services; (2) the name of the interpreter used to explain, in the patient's primary language, the patient's right to free language assistance services; and (3) the patient's reason or refusing language assistance services.

C. Order Defendant to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiff to the position she would have been in but for the discriminatory conduct.

D. Award to Plaintiff:

    i. Nominal damages;

    ii. Compensatory damages;

    iii. Punitive damages;

    iv. Reasonable costs and attorney's fees;

    v. Interest on all amounts at the highest rates and earliest dates allowed by law; and

    vi. Any and all other relief that this Court deems just and appropriate.

Dated: May 21, 2024

Respectfully submitted,

**EISENBERG & BAUM, LLP**

/s/Andrew Rozynski
Andrew Rozynski, Esq. (NY#505446)
24 Union Square East, Penthouse
New York, NY 10003
Telephone: (212) 353-8700
Fax: (917) 591-2875
arozynski@eandblaw.com
*Attorneys for Plaintiffs*